UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
Leicha RICHARDSON-HOLNESS,

                Plaintiff,

- v. -

Michael A. ALEXANDER,

                Defendant.

----------------------------------------------------------x

OPINION AND ORDER

13-cv-2761 (NG)

GERSHON, United States District Judge:

Plaintiff Leicha Richardson-Holness claims that defendant Michael A. Alexander, the principal of the New York City public school at which plaintiff used to teach, sexually harassed her and then retaliated against her for resisting his advances. On the basis of these allegations, plaintiff has brought a set of claims under 42 U.S.C. § 1983—specifically, a First Amendment retaliation claim as well as claims under the Equal Protection Clause asserting disparate treatment, hostile work environment, and quid pro quo harassment. Defendant moves for summary judgment on all claims. For reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND[1]

In February 2008, plaintiff took a probationary teaching position at the School for Human Rights ("SHR') in Brooklyn, New York. She was hired by defendant to teach English Language Arts and perform duties in the dean's office, mostly involving the instruction of disruptive students removed from class. Plaintiff testified that she was given the title "Dean of Discipline."

---

[1] Unless otherwise noted, the facts recited here are undisputed.

1

According to plaintiff, defendant began to harass her shortly after her arrival at SHR by staring at her from outside her classroom and dropping in on her as frequently as ten times a day. During these visits, plaintiff claims, defendant would often attempt to massage her shoulders, particularly if no one else was in the room. Plaintiff also testified that defendant complimented her appearance and dress, once commenting that she had "nice legs."

Plaintiff claims further that defendant called her into his office at the outset of the 2008-2009 school year and inquired, based on rumors he had heard, whether she had thoughts of leaving SHR. According to plaintiff, defendant emphasized during this meeting, as he had several times previously, that he had done plaintiff a "favor" by hiring her and stated, in a sexually suggestive manner, that he expected the favor to be returned. Plaintiff claims that, when she rose to leave defendant's office, he embraced her unexpectedly and groped her buttocks.

Around the same time, according to plaintiff, defendant called her on her mobile telephone at five p.m. on a Friday and asked about her plans for the weekend. During this conversation, plaintiff claims, defendant made reference to "incentive pay" other teachers were receiving and inquired whether plaintiff had received the same. Finding these inquiries inappropriate, plaintiff promptly ended the conversation.

Plaintiff claims that her resistance to defendant's sexual advances caused him to become hostile and that, as the 2008-2009 school year progressed, he frequently admonished her with unwarranted severity. Plaintiff testified that colleagues who witnessed defendant upbraiding her made attempts to intervene on her behalf and that one colleague was driven to tears. The stress of these episodes also took an alleged toll on plaintiff, who testified that she lost appetite and would feel physically ill, to the point of vomiting, on her way to work. In October 2008, plaintiff sought treatment for anxiety and was hospitalized for several days.

Plaintiff's troubles escalated over the course of the school year. Although she had received an overall satisfactory rating for 2007-2008, plaintiff received unsatisfactory performance ratings from assistant principal Antoinette Martin in October 2008 and February 2009. In December of 2008, defendant reprimanded plaintiff for being absent eight times over the prior four months, and, plaintiff claims, that, around the same time, she was relieved of her "dean" title. Plaintiff also contends that incompatible demands defendant placed on her schedule forced her to miss required student group sessions over the first half of the school year. She was written up for these absences in March 2009 by both defendant and Martin.

Plaintiff was accused of more serious misconduct in March 2009. Specifically, on March 4, defendant had a meeting with two sixth grade students allegedly involved in prostitution. Defendant's position is that one of the student's parents, who was present at the meeting, told him that she had been discussing the prostitution allegations with plaintiff for two months. Defendant reprimanded plaintiff for having failed to notify administrators of the matter, as was required by school protocol.

Then, on March 13, 2009, defendant had a meeting with the father and stepmother of a different student. According to a letter defendant prepared after the meeting, the student's father told defendant that his daughter had tattooed plaintiff's name on her body, expressed an interest in living with plaintiff, had potentially been to plaintiff's house, and had been driven home by plaintiff on multiple occasions.[2] Defendant contacted a Department of Education ("DOE") lawyer after the meeting, and was told to report the matter to the Special Commissioner of Investigation of the New York City School District ("SCI"), which defendant did that same day.

---

[2] Plaintiff appears to contend that defendant, and not the student's father, somehow originated these allegations. There is no evidence supporting that version of events.

3

On March 27, 2009, after an SCI investigation had been initiated, plaintiff was reassigned to a different school.

Over the ensuing months, SCI investigators conducted interviews of plaintiff, the student at issue, and the student's parents. The SCI's findings, issued August 12, 2009, confirmed that the student had indeed tattooed plaintiff's name to her body and received automobile rides from plaintiff (albeit with her mother's permission in at least some instances). In addition, phone records obtained by the investigators revealed a total of 122 calls placed between plaintiff and the student, with 102 of those calls being initiated by the student. Plaintiff also admitted to investigators that she purchased a handbag for the student as a birthday present.[3] In light of these facts, the SCI concluded that plaintiff had "developed and maintained an inappropriate and personal relationship with a 15-year-old student which, at a minimum, bore the appearance of impropriety." SCI Report, dated August 12, 2009, at 3. The SCI recommended that plaintiff "be subject to appropriate disciplinary action and that she be advised that further similar actions in the future may lead to her termination." *Id.*

After the SCI issued its report, Theresa Europe, a DOE official whose title is not specified in the record, directed defendant to summon plaintiff for a disciplinary conference. Europe told defendant that plaintiff should be given a letter of reprimand and that defendant could discontinue her probationary employment if he felt "the matter warrants more severe action." Email from Theresa Europe, dated August 12, 2009.

On September 8, 2009, defendant held a conference with plaintiff and her union representative. After the meeting, defendant sent plaintiff a disciplinary letter, dated October 1, 2009, which he says he drafted on the advice of DOE lawyers. The letter summarized the SCI's

---

[3] Although it is not specified in the SCI's findings, plaintiff claims that assistant principal Suzanne Leister assisted her in purchasing the handbag.

4

findings and concluded that plaintiff had violated DOE Chancellor's regulations that (1) prohibit sexual harassment and (2) bar teachers from transporting students in their personal vehicles.[4] Defendant's letter advised plaintiff that her actions could lead to further disciplinary action and the termination of her employment.

Shortly thereafter, defendant revised plaintiff's 2008-2009 annual evaluation. The initial evaluation, which defendant had issued in June 2009, had given plaintiff an overall unsatisfactory rating while recommending that her probationary service be continued. Defendant revised the evaluation on October 5, 2009 to recommend that plaintiff be terminated. Defendant then forwarded this recommendation to DOE superintendent Ainslie Cumberbatch.

In October 2009, while defendant's termination recommendation was pending with the superintendent, SHR's assistant principal Leister asked plaintiff to chaperone a student party. Payment for this type of "per session" work—that is, work beyond a teacher's official duties—required authorization from the principal. According to plaintiff, she had never had difficulty obtaining payment for per session work in the past. This time, however, defendant denied payment and claimed in a subsequent grievance proceeding, falsely plaintiff contends, that plaintiff was required to obtain his authorization before performing the work. Plaintiff was never paid.

After giving plaintiff an opportunity to respond to the SCI's report and other aspects of her personnel file, Cumberbatch terminated plaintiff's probationary employment on December 10, 2009. Plaintiff appealed the termination. On June 29, 2010, DOE Deputy Chancellor of

---

[4] Although defendant's letter invoked regulations concerning sexual harassment, there is no evidence in the record indicating that plaintiff's relationship with the student was sexual in nature.

Teaching and Learning, Santiago Taveras, affirmed plaintiff's termination and, in doing so, revoked plaintiff's DOE teaching license.

## PROCEDURAL HISTORY

Plaintiff's complaint asserts discrimination, retaliation and conspiracy claims under 42 U.S.C. §§ 1983 & 1985 against defendant, superintendent Cumberbatch, and SHR assistant principal Martin. On defendants' motion, I dismissed plaintiff's § 1985 conspiracy claim as well as all claims against Cumberbatch and Martin. This leaves only plaintiff's § 1983 claims against defendant, specifically, her First Amendment retaliation claim and her claims under the Equal Protection Clause asserting disparate treatment, quid pro quo harassment and hostile work environment.

With discovery complete, defendant has moved for summary judgment on these remaining claims. In opposition, plaintiff does not address her disparate treatment claim. The disparate treatment claim is therefore treated as abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) (noting that, when a counseled litigant opposes a motion for summary judgment, it is appropriate to infer that "claims or defenses that are not defended have been abandoned").

## DISCUSSION

On a defendant's motion for summary judgment, courts must "construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in her favor." *Parade v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 65 (2d Cir. 2014) (internal quotation and bracket marks omitted). Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).

An "extra measure of caution is merited" before summary judgment is granted in discrimination cases. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). This is because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Id.* (internal quotation marks omitted); *Redd v. New York Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012). Caution also is warranted in respect to claims of hostile work environment, because a judge "is generally in no better position than a jury to determine when conduct crosses the line between boorish and inappropriate behavior and actionable sexual harassment." *Schiano*, 445 F.3d at 605 (internal quotation marks omitted).

A.  **Hostile Work Environment**

Claims of hostile work environment are actionable under 42 U.S.C. § 1983 and governed by the standard developed under Title VII. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). To prevail, a plaintiff must produce evidence of harassment "that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation marks omitted). In assessing a claim of hostile work environment, "we look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal citation and quotation marks omitted).

Defendant denies engaging in the harassing conduct plaintiff describes. For purposes of summary judgment, however, his position is that, even if plaintiff's version of events were

credited, the harassment she alleges was insufficiently pervasive or severe to sustain a verdict in her favor. I disagree.

As the Second Circuit recognized in *Redd v. New York Division of Parole*, "[d]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment." 678 F.3d at 180. Here, defendant is alleged to have groped plaintiff's buttocks while alluding to "favors" she owed him. Defendant quibbles that *Redd* involved "repeated touching" of the plaintiff's breasts, *see id.* at 179, whereas this case involves just the one instance of groping. But even a single incident, if sufficiently severe, can render a workplace hostile. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). A rational jury could conclude that the groping plaintiff alleges rises to that level. *See Stathatos v. Gala Res., LLC*, 2010 WL 2024967, at *5 (S.D.N.Y. May 21, 2010) (allegation that defendant "intentionally groped [plaintiff's] buttocks can alone defeat defendants' motion for summary judgment").

In any event, plaintiff does not predicate her hostile work environment claim on the groping incident alone. Defendant is also alleged to have repeatedly massaged plaintiff's shoulders, leered at her suggestively, complimented her dress and legs, and contacted her outside work hours to inquire about her weekend plans. Beyond that, after plaintiff rejected defendant's advances, he repeatedly rebuked her with a severity that allegedly drove one witnessing colleague to tears and required plaintiff to seek inpatient care. Looking at the evidence as a whole, as is required, a jury could find plaintiff's workplace hostile.

B.     **Quid Pro Quo Harassment**

A plaintiff can prevail on a quid pro quo harassment claim by demonstrating that "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998). "A tangible employment action

8

constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. Quid pro quo harassment claims, while first recognized under Title VII, also are actionable under § 1983. *See Ragin v. Newburgh Enlarged City Sch. Dist.*, 2009 WL 4906111, at *7 (S.D.N.Y. Dec. 17, 2009) (analyzing § 1983 quid pro quo claim under Title VII standards); *see also Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (Title VII and parallel § 1983 discrimination claims generally "must stand or fall together.")

Here, plaintiff appears to allege that the following employment actions stemmed from her denial of defendant's advances: (1) the loss of her "dean" title around December 2008; (2) the reprimands she received in March 2009 for missed study group sessions; (3) the unsatisfactory teaching evaluations she received in October 2008 and in February, June and October of 2009; (4) the denial of pay for "per session" work she performed in October 2009; and (5) her December 2009 termination.

On this motion, defendant does not argue that any of the above actions was not a "tangible employment action" that could support a quid pro quo harassment claim. His principal contention is that plaintiff cannot establish causation—that is, that plaintiff's resistance to his alleged sexual advances was a "motivating factor" behind any of the actions at issue.[5] This,

---

[5] *See Lekettey v. City of New York*, 637 Fed. App'x 659, 661 (2d Cir. 2016) (applying motivating factor causation standard to quid pro quo claim). In *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013), the Supreme Court adopted a "but-for" causation standard for Title VII retaliation claims asserted under 42 U.S.C. § 2000e-3(a). Although quid pro quo claims involve an element of retaliation, it is not retaliation in response to an employee's protected activity (the form of retaliation addressed in § 2000e-3(a)) but retaliation in response to an employee's refusal to accede to a supervisor's sexual advances. Courts have thus treated quid pro quo claims as a type of status-based discrimination falling under § 2000e-2(a), and not retaliation cognizable under § 2000e-3(a). *See Ellerth*, 524 U.S. at 751-52. In sum, the "motivating factor" causation standard set out at § 2000e-2(m) remains applicable to status based claims asserted under § 2000e-2(a). *See Nassar* 133 S. Ct. at 2534.

9

defendant contends, is because individuals who are not alleged to have harbored any impermissible bias—namely, assistant principal Martin and superintendent Cumberbatch—were responsible for the actions plaintiff challenges.

Defendant is correct that Martin and Cumberbatch are not alleged to have operated with any discriminatory bias. It is precisely for this reason that I previously dismissed all claims against these former defendants. But Martin or Cumberbatch simply were not involved in all of the employment actions on which plaintiff premises her quid pro quo claim. And their involvement in other of the actions does not, standing alone, entitle defendant to judgment as a matter of law. As the Second Circuit has recognized, employment decisions that are made collectively can be tainted by the bias of a single biased individual so long as the biased party played a "meaningful role" in the decision-making process. *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999). With this principle in mind, I turn to the specific employment actions here at issue.

***Loss of "Dean" Title.*** Defendant never directly addresses plaintiff's claim that defendant deprived her of a "dean" title because she rebuffed his overtures. Defendant's position seems to be that plaintiff was never a "dean" and thus never demoted. But that is an assertion of fact as to which a jury could permissibly find against defendant. Notably, the record contains an email from assistant principal Leister, purportedly sent to defendant in December 2008, in which Leister states that she had "received your letter stating that [plaintiff] has been relieved of her duty as a Dean." Declaration of Richardson-Holness, dated February 22, 2016, Ex. D at 1. Another SHR document in the record describes plaintiff as "Head Dean." *Id.* at Ex. C.

If a jury were to find that plaintiff was in fact demoted, as the evidence would permit, it could also fairly conclude that the demotion was motivated at least in part by her rejection of

defendant's sexual advances. Indeed, having taken the position that plaintiff was never a "dean," defendant offers no non-discriminatory justification for the employment action.

***Reprimands for Missed Study Group Sessions.*** Plaintiff claims that the two letters of reprimand she received in March 2009 for missing required study group sessions were in response to her resisting defendant's advances. One of these letters was written by assistant principal Martin, and the other was written by defendant.

To begin with, there is no evidence that Martin reprimanded plaintiff at defendant's behest or that defendant otherwise played a "meaningful role" in Martin's decision to issue the reprimand. There is, accordingly, no basis to conclude that Martin's letter of reprimand was caused by any improper motives defendant may have harbored. Plaintiff thus cannot predicate a quid pro quo harassment claim on Martin's letter.

The analysis is different with respect to defendant's own letter. Defendant seems to contend that, in reprimanding Martin, he was serving merely as a passive conduit for complaints originated by Martin. But there is evidence that defendant played an affirmative role. Indeed, defendant's letter itself indicates that Martin provided him with only a timesheet for the study group sessions, and that, after defendant realized plaintiff's signature was missing, defendant conducted his own investigation. Defendant's letter also went far beyond Martin's in characterizing plaintiff's absences as "insubordination" and "a blatant disregard for school policy" that could "lead to further disciplinary actions including an unsatisfactory rating in June." Declaration of Laura C. Rowntree, dated Nov. 13, 2015 ("Rowntree Decl."), Ex. N at 1. Because defendant did much more than pass along Martin's complaints, a jury could readily conclude that retaliatory bias he harbored impacted both his decision to separately reprimand plaintiff and the severity with which he did so.

*Unsatisfactory Teaching Evaluations*. Plaintiff received four unsatisfactory teaching evaluations for the 2008-2009 school year. The first two were issued by Martin. As with her March 2009 letter of reprimand, there simply is no evidence that Martin's teaching evaluations were influenced by defendant's allegedly improper biases. Martin's evaluations thus cannot support a quid pro quo harassment claim.

But defendant himself issued plaintiff two negative evaluations for the 2008-2009 school year. Defendant contends, once again, that he relied entirely on Martin's reports in evaluating plaintiff's teaching. But the record does not compel that conclusion. To the contrary, there is no dispute that defendant monitored plaintiff's teaching throughout the school year and, significantly, his evaluations critique plaintiff on a range of skills not addressed in Martin's reports. Moreover, defendant's final evaluation recommended that plaintiff be terminated, which is not something Martin recommended. A jury could rationally conclude that defendant exercised independent judgment in evaluating plaintiff and that improper biases he labored under influenced the marks and recommendations he gave.

*Denial of Per Session Pay*. Defendant claims that he denied plaintiff pay for per session work she performed in October 2009 only because plaintiff requested payment after, and not before, the work was performed.[6] But defendant has not introduced evidence of any policy requiring that pay be pre-authorized. And, importantly, plaintiff testified that in the past she had routinely received pay for per-session work without such pre-authorization. Plaintiff's prior experience, which at this juncture must be credited, casts doubt on defendant's proffered

---

[6] Defendant also contends that plaintiff abandoned any claim relating to the per session work pay by failing to address the issue in her summary judgment opposition. Plaintiff, however, addressed the per-session pay issue on page two of her opposition brief. Her analysis is cursory, to be sure, but not so cursory as to deem the claim abandoned.

nondiscriminatory reasons for denying her pay and supports an inference that defendant's explanation is in fact "a pretext for a prohibited reason." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (observing that a plaintiff can establish causation by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in an employer's proffered legitimate . . . reasons for its actions").

*Termination*. Plaintiff acknowledges, as she must, that she was terminated by superintendent Cumberbatch (not defendant) and that, in rendering the termination decision, Cumberbatch considered the SCI's conclusion that plaintiff had maintained an inappropriate relationship with a student. The record also shows that the SCI's investigation was initiated not by defendant but by a parent. Defendant contends that these facts preclude plaintiff from establishing that her termination was motivated, at least in part, by plaintiff's resistance to defendant's advances.

What defendant overlooks is that the SCI's report did not recommend that plaintiff be terminated. Rather, the SCI's recommendation was that plaintiff "be subject to appropriate disciplinary action and that she be advised that further similar actions in the future may lead to her termination." SCI Report, dated August 12, 2009, at 3. Defendant was subsequently advised by a superior DOE official that he had discretion to terminate plaintiff if he believed termination was appropriate. The record shows that defendant exercised that discretion by amending plaintiff's 2008-2009 performance evaluation to recommend discontinuance, a recommendation that he then forwarded to Cumberbatch. There is no indication that Cumberbatch or any other DOE official took any steps to terminate plaintiff until defendant recommended that course of action. Nor has defendant provided any explanation as to why he recommended sanctions that were more severe than those proposed by the SCI. Defendant may be able to establish that his

13

recommendation was predicated entirely on non-discriminatory considerations, but the record before the court does not foreclose the possibility that he was motivated at least in part by a desire to punish plaintiff for her refusal to accede to his sexual advances.

In sum, plaintiff cannot establish causation as to Martin's March 2009 letter of reprimand or Martin's negative teaching evaluations. Accordingly, defendant's summary judgment motion is granted on plaintiff's quid pro quo harassment claim to the extent the claim is predicated on those employment actions. Defendant's motion is denied as to the other employment actions plaintiff is challenging, specifically: (1) the loss of her "dean" title; (2) defendant's March 2009 letter of reprimand; (3) the negative teaching evaluations she received from defendant in June and October 2009; (4) the denial of pay for October 2009 per session work; and (5) her termination.

### C. First Amendment Retaliation

Plaintiff contends that her rejection of defendant's sexual advances also constituted an exercise of First Amendment intimate associational rights—specifically, her asserted freedom not to engage in an unwanted extramarital sexual relationship. *See Adler v. Pataki*, 185 F.3d 35, 41-44 (2d Cir. 1999) (discussing scope and constitutional source of freedom of intimate association). By taking actions against her for resisting, plaintiff contends, defendant retaliated in violation of the First Amendment. I denied defendant's motion to dismiss this novel First Amendment claim, holding primarily that plaintiff need not satisfy the "public concern" requirement that applies to First Amendment claims predicated on expressive rights.

On summary judgment, defendant does not dispute that plaintiff's resistance to his alleged advances constituted an invocation of First Amendment rights. His position is that summary judgment is nevertheless warranted for the same reason he asserts as to the quid pro

14

quo claim—that is, because plaintiff cannot show that her resistance was the cause of any of the employment actions she challenges.[7] In so arguing, defendant accepts that the "motivating factor" causation standard, applicable to the quid pro quo claim, applies to the First Amendment retaliation claim as well. *See Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010). Because the claims are premised on the same factual allegations, and subject to the same standard, the foregoing discussion of plaintiff's quid pro quo claim applies with equal force to her First Amendment claim. Defendant is thus entitled to summary judgment on the First Amendment claim to the extent it is predicated on Martin's letter of reprimand and negative teaching evaluations.

With trial now on the horizon, it is appropriate to note that plaintiff's First Amendment claim appears problematic in respects the parties have not addressed. To begin with, because plaintiff's theory of First Amendment retaliation is duplicative of her quid pro quo harassment theory, presenting both claims to the jury generates a risk of juror confusion and inconsistent verdicts. I also question the legal viability of the First Amendment claim, foremost because the intimate associational rights plaintiff asserts appear to derive from substantive due process protections and not the First Amendment.[8] This is significant because, "where a substantive due

---

[7] Defendant advances only one additional causation argument on the First Amendment claim, namely, that plaintiff cannot show that defendant *harassed her* based on her right of intimate association with her husband. That, however, is not the relevant causation inquiry. The question is whether defendant *retaliated against her* because she asserted such rights. On that issue, defendant's contentions on the First Amendment and quid pro quo claims are indistinguishable.

[8] As I observed at the motion to dismiss stage, courts have at times traced the right of intimate association to the First Amendment and elsewhere characterized it as a liberty interest protected by the substantive aspect of the Due Process Clause. *See Adler*, 185 F.3d at 42-43 (summarizing cases). Significantly, however, the Supreme Court's most recent discussion of the right of intimate association in *Obergefell v. Hodges*, decided after the motion to dismiss, unequivocally construed the right as a due process protection. *See* 135 S. Ct. 2584, 2600 (2015), *also id.* at 2616 (Roberts, J., dissenting) (observing that no First Amendment claim was at issue).

15

process claim is duplicative of an equal protection claim, the substantive due process claim should be dismissed." *Segreto v. Town of Islip*, 2014 WL 737531, at *5 (E.D.N.Y. Feb. 24, 2014); *see also Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").

Here, there is no dispute that the conduct underlying plaintiff's intimate association claim—quid pro quo harassment—is prohibited by the Equal Protection Clause, which is generally understood to embody the Constitution's proscriptions against sex discrimination. *See Raspardo v. Carlone*, 770 F.3d 97, 113-14 (2d Cir. 2014); *Ragin*, 2009 WL 4906111, at *7. Accordingly, to the extent the intimate associational rights plaintiff asserts arise under the Due Process Clause, and not the First Amendment, as seems to be the case, the appropriate course is to dismiss the intimate association claim as duplicative.

Restricting plaintiff to her Equal Protection theory, which rests on established law, also would obviate a delineation of the precise substantive due process right at issue. Indeed, plaintiff has not identified, and the court has not found, any authority recognizing quid pro quo harassment as a substantive due process violation. As the Supreme Court has cautioned, courts must "exercise the utmost care whenever we are asked to break new ground in this field." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal quotation marks omitted).

---

*Obergefell* may not foreclose treating the right of intimate association as a First Amendment concern in appropriate cases. But that would seem a dubious course here. For one thing, doing so would support treating all instances of quid pro quo harassment as First Amendment retaliation. Plaintiff also is not claiming any impingement on First Amendment expression. She does not assert, for example, that adverse actions were taken against her for speaking out about the harassment she experienced. Nor does she claim, as in *Adler*, that the adverse actions were triggered by the expressive conduct of her spouse or other intimate associate. *See Adler*, 185 F.3d at 44.

The parties should be prepared to address these issues in their proposed pretrial order, discussing in particular whether plaintiff wants to pursue an intimate associational claim beyond the claim she asserts under the Equal Protection Clause and, if so, the proper constitutional source of that claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted as to plaintiff's disparate treatment claim and denied as to her hostile work environment claim. Summary judgment is granted on plaintiff's quid pro quo harassment and First Amendment retaliation claims to the extent those claims are predicated on Martin's March 2009 letter of reprimand and negative teaching evaluations. Summary judgment is denied on these claims as to the remaining employment actions addressed above. The parties are instructed to file by August 31, 2016 a joint proposed pretrial order prepared in accordance with this order and the court's individual practices.

SO ORDERED.

/s/ Nina Gershon

NINA GERSHON
United States District Judge

Dated: Brooklyn, New York
July 25, 2016